**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

ECHO GLOBAL LOGISTICS, INC.,

     Plaintiff,

  v.

DFW LINQ TRANSPORT INC. d/b/a LINQ
TRANSPORT, CONNER BUCKLEY,
ROBERT SCHEETZ, JOHN MERCER, SAM
LUCANIA, AND RALPH HUSZAR,

     Defendants.

Case No. 18-cv-5458

Judge Charles R. Norgle, Sr.
Magistrate Judge Jeffrey Cole

**JURY TRIAL DEMANDED**

---

## FIRST AMENDED COMPLAINT FOR INJUNCTIVE AND OTHER RELIEF

Plaintiff Echo Global Logistics, Inc. ("Echo"), by its undersigned counsel, brings this First Amended Complaint for Injunctive and Other Relief ("Complaint") against Defendants DFW Linq Transport Inc. d/b/a LinQ Transport ("Linq"), Conner Buckley ("Buckley"), Robert Scheetz ("Scheetz"), John Mercer ("Mercer"), Sam Lucania ("Lucania"), and Ralph Huszar ("Huszar") (collectively, "Defendants"). In support, Echo states as follows:

### NATURE OF COMPLAINT

1. This is an action for the individual Defendants' breaches of their restrictive covenants, for all Defendants' tortious interference with the contractual relationships of Echo employees and customers, for Linq's, Scheetz's, Mercer's, Lucania's, and Huszar's tortious interference with Echo's customer relationships, and for Linq's unfair competition.

2. This action arises from Linq's employment of the individual Defendants and all Defendants' solicitation of Echo's customers and employees.

3.      Echo is a leading provider of technology-enabled transportation and supply chain management solutions.  Buckley, Scheetz, Mercer, Lucania, and Huszar are former Echo employees who left Echo for Linq, a direct competitor of Echo.

4.      Since at least February of 2018, Linq has engaged in a campaign of soliciting Echo's employees and encouraging them to violate their restrictive covenants for the benefit of Linq and to the detriment of Echo.

## PARTIES, JURISDICTION, AND VENUE

5.      Echo is a Delaware corporation, organized under the State of Delaware, with its principal place of business in Chicago, Illinois.

6.      Defendant DFW Linq Transport Inc. d/b/a LinQ Transport is a Texas corporation with its principal place of business in Irving, Texas.

7.      Defendant Buckley is domiciled in Texas at 4119 Juliard Drive, Addison, Texas.

8.      Defendant Scheetz is domiciled in Texas at 3420 Westminster Avenue, Dallas, Texas.

9.      Defendant Mercer is domiciled in Texas at 1714 Nightingale Lane, Corinth, Texas.

10.     Defendant Lucania is domiciled in Texas at 1004 Bristlewood Drive, McKinney, Texas.

11.     Defendant Huszar is domiciled in Texas at 1521 Newton Ranch Road, Keller, Texas.

12.     Personal jurisdiction over the individual Defendants is proper because, by executing an Employment and Business Protection Agreement with Echo, each individual Defendant irrevocably consented to the exercise of personal jurisdiction over them by the United

States District Court for the Northern District of Illinois. *See* Exhibits A-E at section 10; *see also TruServ Corp. v. Flegles, Inc.*, 419 F.3d 584, 589 (7th Cir. 2005).

13.     Personal jurisdiction over Linq is proper because Linq is closely related to the dispute as alleged herein such that it was foreseeable that Linq would be bound by the forum selection clauses in the individual Defendants' Employment and Business Protection Agreements with Echo. *See DMC Mach. Am., Corp. v. Heartland Mach. & Eng'g, LLC*, No. 16-cv-269, 2016 U.S. Dist. LEXIS 152494, at *8-9 (N.D. Ill. Nov. 2, 2016); *Medtronic, Inc. v. Endologix, Inc.*, 530 F. Supp. 2d 1054, 1056-57 (D. Minn. 2008); *Universal Credit Servs. v. Hawkins*, No. 17-799, 2017 U.S. Dist. LEXIS 40795 (E.D. Pa. Mar. 17, 2017).

14.     Subject matter jurisdiction is proper in this Court pursuant to 28 U.S.C. § 1332(a) because Echo and Defendants are citizens of different states and the amount in controversy, exclusive of interest and costs, exceeds $75,000.

15.     Venue is proper in this Court because, by executing the Employment and Business Protection Agreements with Echo, each individual Defendant agreed that any litigation arising under the agreements "shall be instituted and commenced and venue shall be exclusively in the state courts of Illinois, or the United States District Court for the Northern District of Illinois;" and Linq is closely related to the dispute as alleged herein such that it was foreseeable that Linq would be bound by the foregoing forum selection clauses. *See* Exhibits A-E at section 10; *see also Muzumdar v. Wellness Int'l Network, Ltd.*, 438 F.3d 759, 762 (7th Cir. 2006).

## FACTUAL BACKGROUND

### Corporate Background

16.     Echo is a leading provider of technology-enabled transportation and supply chain management solutions. Echo utilizes a proprietary technology platform to compile and analyze

3

data from its multi-modal network of transportation providers to satisfy the transportation and logistics needs of its clients.

17. Echo focuses primarily on arranging transportation with truckload ("TL") and less than truckload ("LTL") carriers. Echo also offers intermodal, small parcel, domestic air, expedited and international transportation services.

18. Echo's core logistics services include rate negotiation, shipment execution and tracking, carrier selection and management, freight bill payment and audit, payment and performance management and reporting functions, including executive dashboard tools.

19. Echo procures transportation and provides logistics services for clients across a wide range of industries, including manufacturing, construction, food and beverage, consumer products and retail.

20. Part of Echo's success derives from its ongoing customer relationships and customer retention rate. Echo invests tremendous time and effort into developing and maintaining these relationships and Echo relies on repeat business as part of its business model.

21. Echo's ongoing investment in technology and the training of its personnel has further placed Echo as a leading provider of technology-enabled transportation management solutions with enhanced scale in the TL market, and has allowed Echo to offer greater capacity and a broader network to its clients.

### Mercer's, Scheetz's, Buckley's, Lucania's, and Huszar's Employment at Echo

22. On March 15, 2016, Echo hired Conner Buckley ("Buckley") to conduct inside sales as a client sale representative. In connection with his employment, Buckley signed an Employment and Business Protection Agreement, effective March 15, 2016 (the "Buckley Restrictive Covenant"). A copy of the Buckley Restrictive Covenant Agreement is attached as Exhibit A.

4

23.     On January 16, 2017, Echo hired Robert Scheetz ("Scheetz") to conduct inside sales as a client sale representative.  In connection with his employment, Scheetz signed an Employment and Business Protection Agreement, effective January 16, 2017 (the "Scheetz Restrictive Covenant").  A copy of the Scheetz Restrictive Covenant Agreement is attached as Exhibit B.

24.     On June 12, 2017, Echo hired John Mercer ("Mercer") to conduct inside sales as a client sale representative.  In connection with his employment, Mercer signed an Employment and Business Protection Agreement, effective June 12, 2017 (the "Mercer Restrictive Covenant").  A copy of the Mercer Restrictive Covenant Agreement is attached as Exhibit C.

25.     On June 12, 2017, Echo hired Sam Lucania ("Lucania") to conduct inside sales as a client sale representative.  In connection with his employment, Lucania signed an Employment and Business Protection Agreement, effective June 12, 2017 (the "Lucania Restrictive Covenant").  A copy of the Lucania Restrictive Covenant Agreement is attached as Exhibit D.

26.     On June 12, 2017, Echo hired Ralph Huszar ("Huszar") to conduct inside sales as a client sale representative.  In connection with his employment, Huszar signed an Employment and Business Protection Agreement, effective June 12, 2017 (the "Huszar Restrictive Covenant" and collectively with the Buckley, Scheetz, Mercer, and Lucania Restrictive Covenants, the "Restrictive Covenants").  A copy of the Huszar Restrictive Covenant Agreement is attached as Exhibit E.

27.     As consideration for the signing of the Restrictive Covenants, Buckley, Scheetz, Mercer, Lucania, and Huszar received employment.  In addition to this consideration, each also received confidential information, received a generous salary and benefits, and were given opportunities to develop customer relationships, which would further their careers and increase

their compensation. Moreover, they were provided a regimented and rigorous four-week training program developed by, and unique to, Echo.

28. The Restrictive Covenants provide, in relevant part:

a. Covenant Not to Compete. Unless you receive the prior express written consent of Echo, you shall not, at any time during your employment and, for six (6) months after the termination thereof by either party for any or no reason, directly or indirectly (whether as a sole proprietor, owner, employer, partner, investor, shareholder, member employee, consultant, or otherwise), seek or accept a position or engagement in any executive, managerial, sales, marketing, operations, sourcing, customer service, research, consulting or other competitive capacity with any competing businesses which shall include:

i. Any or all of the freight contracting, contract logistics, freight forwarding, transportation logistics, transportation-related information systems businesses, motor-carrier, shipper or custom house brokerage business, including but not limited to, the list of entities attached hereto as Exhibit B;

ii. Any other business or activity that Echo or any of its affiliates enters into now or in the future and with respect to which you became involved or with respect to which you had access to Confidential Information.

b. Employees. Unless you receive the prior express written consent of Echo, you shall not during the term of your employment and for eighteen (18) months after termination of your employment, induce or attempt to induce, directly or by assisting others, any person who is in the employment of Echo to leave such employment for the purpose of accepting other employment with or providing services to a person or entity that provides products or services that are competitive with Echo.

c. Corporate Contacts. Unless you receive the prior express, written consent of Echo, you shall not, during the term of your employment and for eighteen (18) months after termination of your employment, for purposes of providing products or services that are competitive with Echo, solicit or attempt to solicit, directly or by assisting others, any work, services, goods, or other business from any of Corporate Contacts (as defined in Paragraph 4) of Echo.

Exhibits A, B, C, D, and E at pg. 2, section 5.

29. Pursuant to the Restrictive Covenants, Buckley, Scheetz, Mercer, Lucania, and Huszar were notified that "during the course of your employment with Echo, you will have

6

access to Confidential Information, the ownership and confidential status of which are highly

important to Echo and among Echo's most valuable and important assets." Confidential

Information in the Restrictive Covenants is defined to include:

> [A]ny information of Echo (including any parent, subsidiary, predecessor, successor, or otherwise affiliated corporation, partnership or other business enterprise), whether or not in written form, which has not been previously disclosed to the general public by Echo and which is either designated or treated by Echo as confidential or proprietary, or which Echo is obligated to keep confidential because it has been provided by people or entities other than Echo. Consistent with the definition set forth above, the term "Confidential Information" shall include, but is not limited to, Echo's: trade secrets; product, research and development information; inventions; methods of conducting or obtaining business, including but not limited to, methods of marketing, client acquisition and development, billing for services, and compensation; corporate documents, plans or manuals; finances; legal affairs; labor reports; identified locations for new operations; actual or prospective (if known to you or you had access to during employment) clients, Customers (as defined below), motor-carriers, transportation providers, vendors or investors (collectively "Corporate Contacts"); and other information marked, designated and/or treated by Echo as confidential.

> > i. For purposes of this Agreement, "Customer" means any customer of Echo with respect to whom: (1) the Employee performed services for on behalf of Echo; or (2) had substantial contact with the Employee; or (3) had access to or acquired Confidential Information as a result of or in connection with the Employee's employment.

Exhibits A, B, C, D, and E at pg. 1, section 4(a).

30.     In accordance with the Restrictive Covenants, Buckley, Scheetz, Mercer, Lucania,

and Huszar agreed to protect the Company's Confidential Information:

> You agree to hold all Confidential Information in a fiduciary capacity and to exercise the highest degree of care in safeguarding Confidential Information against loss, theft, or other inadvertent disclosure, and shall take all steps reasonably necessary to maintain the confidentiality thereof. You shall not, directly or indirectly, either during the term of your employment (except as required in the normal course of the performance of your duties), or at any time after your employment is terminated for any reason: (i) disclose or furnish to any person, corporation or other entity, or use in your own or in any other person's business, any Confidential Information; (ii) utilize Confidential Information for the gain, advantage, or profit of anyone other than Echo; (iii) remove any Confidential Information from Echo's premises; or (iv) take advantage of any

> business opportunity which, because of Confidential Information obtained in your employment capacity or as a result of your employment, you know Echo may or is likely to consider.

Exhibits A, B, C, D, and E at pg. 1, section 4(b).

31.     Buckley, Scheetz, Mercer, Lucania, and Huszar further agreed, upon cessation of their employment, to return as soon as possible to Echo all "Confidential Information and other materials furnished to [them] by Echo, used on its behalf, or generated or obtained during the course of [their] employment with Echo." Exhibits A, B, C, D, and E at pg, 3, section 8.

32.     At all relevant times, Buckley, Scheetz, Mercer, Lucania, and Huszar were bound by the obligations in the Restrictive Covenants.

33.     Such Restrictive Covenants are standard in the logistics and transportation sales industry.

34.     The business of Echo, including the business conducted by Buckley, Scheetz, Mercer, Lucania, and Huszar, is, by its nature, nationwide as customers send and receive shipments that travel across the county. Furthermore, sales executives at Echo, like Buckley, Scheetz, Mercer, Lucania, and Huszar, reach out to customers throughout the United States and even North America. Thus, many of Echo's customers are located outside of Illinois and Texas, and may even have multiple distribution centers across the country.

35.     Indeed, Buckley, Scheetz, Mercer, Lucania, and Huszar acknowledged in their Restrictive Covenants the broad geographical scope of their employment, and further acknowledged the similarly broad geographical protection contemplated by their Restrictive Covenants:

> You understand that Echo is a national corporation that does business throughout the United States, Canada and Mexico. In your employment with Echo, you may perform services in more than one city, county, state or country, and may have access to Confidential Information that pertains not only to the specific area in which you live and/or work but also to other areas in which Echo does business.

> You agree that Echo protections stated in this Agreement are intended to protect Echo to the fullest extent of the law in all of the geographical areas in which Echo does business or is actively contemplating doing business. You further expressly acknowledge and agree that each of Echo protections stated herein is intended to be as broad as may be permitted under the provisions of applicable law. You further acknowledge and agree that if any of the protections herein are deemed unenforceable, the unenforceability of any one or more Echo protections stated herein (or any portion thereof), shall not affect the enforceability of any other protection (or portion thereof) stated herein.

Exhibits A, B, C, D, and E at pg. 2, section 6(b).

36.     As Echo employees, Buckley, Scheetz, Mercer, Lucania, and Huszar owed fiduciary duties of fidelity, trust, and loyalty to Echo.  Buckley, Scheetz, Mercer, Lucania, and Huszar each had an obligation to act in the best interest of Echo during the employment relationship and not use its confidential information for the benefit of themselves or others.

37.     Buckley, Scheetz, Mercer, Lucania, and Huszar were required to sign and acknowledge these obligations in the Echo Employee Handbook, among other places. All Echo employees must sign an acknowledgement form, acknowledging that they received, read, and understand the Employee Handbook.

38.     As part of their employment at Echo, Buckley, Scheetz, Mercer, Lucania, and Huszar had access to confidential company information, including but not limited to, customer lists, customer distribution centers, rates and pricing histories, customer routes, frequencies of routes, lane histories, types of loads, carrier lists, and profit margins.

39.     This information could only be accessed after logging on to a secured database using an unique ID and password.

40.     Buckley, Scheetz, Mercer, Lucania, and Huszar had access to this confidential company information through Echo's customer databases, Optimizer, and Stats, among other ways.  In Optimizer and Stats, Buckley, Scheetz, Mercer, Lucania, and Huszar could access confidential information about their own customers and accounts, as well as other Echo

customers and accounts. The information contained in Optimizer was kept behind an additional security threshold, requiring another unique ID and password to log onto the machine.

41.     In addition, within Optimizer, not all information was accessible to all people, as access was limited based upon seniority and position within the company.

42.     At all relevant times, Echo made and continues to make reasonable efforts to maintain the secrecy of its confidential company information, including by providing Echo employees with unique log-in credentials for Optimizer and Stats.

43.     Buckley, Scheetz, Mercer, Lucania, and Huszar each participated in a four week training program at Echo when they first started employment. In that four week training program, they were given intensive training about the logistics industry, confidential Echo information systems (including Optimizer and Stats), and sales methods and techniques. After that four week training program, they were each placed on a specific Echo team with a mentor (called a "pod leader"), who would help them develop their skills as a logistics consultant and sales representative.

### Buckley, Scheetz, Mercer, Lucania, and Huszar Violate Their Obligations to Echo

44.     Within the last two months, Echo began to learn about Linq's aggressive and surreptitious poaching of Echo's employees. While Echo's investigation is ongoing into how many of its employees have been poached by Linq, over the past two weeks, a clear pattern has now emerged: Linq is raiding Echo's employee base.

45.     Specifically, it is now clear that Linq is targeting Echo employees who have already been extensively trained and mentored by Echo in the logistics industry in order to avoid having to invest any time, money, or effort into building its own competent employee base.

46.     The first known employee to be recruited to Linq was Buckley; Buckley, at the time of his departure, however, hid his intention to go to Linq.

47.     When Buckley terminated his employment with Echo effective February 16, 2018, he stated that he was pursuing a Master's degree.  Contrary to Buckley's representation, Echo recently learned, after the hire of the <u>fourth</u> Echo employee by Linq, that he had actually accepted a competitive position at Linq as a logistics consultant and sales representative in April of 2018, and continues in that position today.

48.     Through its investigation, Echo has come to learn that Linq's methodology appears to be locate a member of Echo's Dallas branch, and then utilize that team member's knowledge of Echo's workforce to "link in" with additional Echo employees and solicit their employment.

49.     Shortly after Buckley was hired, Scheetz terminated his employment with Echo effective April 5, 2018 and he immediately accepted a competitive position at Linq as a logistics consultant and sales representative around April of 2018, and continues in that position today.

50.     Staggering their departure dates, Mercer next terminated his employment with Echo, effective April 26, 2018.  Rather than reveal that he was going to join two of his colleagues at a direct competitor, Mercer concealed where he was going, only stating that he was going to work in training at a logistics company.  In fact, after finding out about Mercer's plans, an Echo representative explicitly reminded Mercer of his obligations under his Restrictive Covenant and Mercer acknowledged his understanding of his restrictions.  It was only recently that Echo learned Mercer had accepted a competitive position at Linq as a Quality Assurance Manager and Trainer and continues in that position today.

51.     Three weeks later, solicited through the same surreptitious pattern as the other Echo employees, Lucania terminated his employment with Echo effective May 16, 2018.  At that time, Lucania likewise hid the fact that he was going to work for Linq, instead stating that he was

pursuing a position as a logistics analyst at Daisy, a non-competitive position. Again, Echo has recently learned that Luciana joined his former colleagues in a competitive position at Linq as a logistics consultant and sales representative around June of 2018, and continues in that position today.

52.     The most recent employee to depart, Huszar, terminated his employment with Echo effective June 1, 2018. At that time, Huszar likewise misled Echo, stating that he was pursuing a position in medical sales related to eye care. Contrary to Huszar's representation, he, too, accepted a directly competitive position role at Linq as a logistics consultant and sales representative in June of 2018, and continues in that position today.

53.     Each of the individual Defendants had an exit interview on their last day of employment with Echo. At that exit interview, they were each given a copy of their Restrictive Covenant. Each of them was also given an acknowledgement form stating that they had previously executed a Restrictive Covenant, which "contains terms that specifically survive after [their] employment with Echo is terminated or otherwise ended." Each of their acknowledgement forms further state: "Employee acknowledges that he/she has read the [Restrictive Covenant], understands the [Restrictive Covenant], and will adhere to all covenants, restrictions, and prohibitions that apply post-employment termination." Attached as Exhibit K is an example of the acknowledgement form given to each of the individual Defendants.

54.     Despite signing Restrictive Covenants upon commencing their employment with Echo, and signing acknowledgements of the continuing obligations contained within the Restrictive Covenants upon terminating their employment with Echo, each of the individual Defendants willfully breached their obligations to Echo by going to work for Linq. Notably,

none of the individual Defendants told Echo that they intended to work for Linq.  In fact, there was a concerted effort by each of them to lie or conceal their plan to work for Linq.

### The Business of Linq and Its Ongoing Improper Poaching of Echo Customers and Employees

55.     Linq is a Texas-based, worldwide transport and logistics company founded in 2005.  It reports to have only 51-200 employees.

56.     Their reputation in Texas is not a strong one, and in reviewing customer reviews of their service, they have a reputation as a "dishonest company."

57.     Specifically, one Yelp reviewer stated:

This is a very dishonest company. I have personally seen them accept loads from brokers and then leave the customers freight parked on their yard for days and even weeks at a time. They continually lease trailers and trucks and then break the contracts without paying when they decide freight is slowing down. As for working for this company, make sure this is where you plan to stay. If you decide to leave they will do everything they can to keep you from getting hired elsewhere including slander and breaking Texas workforce laws. Linq only cares about themselves and not about the customer. Please don't make the mistake of doing business with this company or the owner (Luis Dayer)!!!!

https://www.yelp.com/biz/linq-transport-and-logistics-irving

58.     Rather than train its own employees, and compete fairly in the Dallas market, it now appears Linq is attempting to disrupt Echo's business by inducing Echo employees to breach their non-compete agreements, and encourage them to assist in the solicitation of Echo employees and customers.

59.     In early 2018, Linq made its first attempt solicit Echo employees, through LinkedIn messaging requests by Janelle Simmons, a Linq recruiter.  The Linq representatives took the Echo employees out to lunch and had discussions about job opportunities at Linq in competitive positions as logistics consultants and sales representatives.

60.    After that initial effort, it appears that Linq was utilizing each former Echo employee to target the next Echo employee. Specifically, on several occasions, it appears that Linq was soliciting an employee to gain information about other Echo employees, then using that information to subsequently target that employee member.

61.    This method seems to include also using Echo employees for their business, moving that business to another Echo employee, and then terminating the former Echo employee.

62.    For example, around May of 2018, after Mercer started working at Linq, a Linq representative discussed with him the potential employment of former Echo employee James Cason ("Cason") at Linq. Shortly thereafter, Cason was hired at Linq.

63.    On June 25, 2018, Echo received an email from Mercer relating to current Linq business with Company K,[1] an Echo customer. At that time, Mercer was a Linq employee. The email was sent to Huszar's Echo email address, although, at the time of the email, Huszar worked with Mercer at Linq. Presumably, Mercer intended to send this email to Huszar's Linq email address.

64.    The underlying June 25, 2018 email indicated that Mercer and Huszar were responsible for a Company K truckload from Cedar, UT to Forest Park, GA.

65.    Company K, however, was one of the accounts of former Echo employee Cason while he was employed by Echo. Company K was one of Echo's biggest accounts in the Echo Dallas office. Huszar knew when he was employed by Echo that Company K was an Echo customer.

---

[1] This customer name has been removed because the identity is considered confidential. It will be provided upon execution of a confidentiality agreement, or by the request of the court *in camera*.

66.     Also around May of 2018, after Mercer started working at Linq, Mercer convinced Linq to hire Huszar.  Shortly thereafter, Huszar was hired at Linq.

67.     Since then, several other Echo employees have been contacted by Linq through LinkedIn messaging requests from Simmons, a Linq recruiter.

68.     Echo also learned that Mercer would be compensated by Linq with a base salary plus five percent of the commissions each of his Linq trainees receives for the first year of their employment.  This commission incentive is far out of step with industry norms.

### Buckley, Scheetz, Mercer, Huszar, Lucania, and Linq refuse to cease their wrongful and ongoing conduct

69.     Shortly after learning of Buckley's, Scheetz's, Mercer's, and Huszar's employment at Linq, on July 3, Echo sent letters to each of them, which are attached as Exhibits F-I ("Employee Cease and Desist Letters").  The Employee Cease and Desist Letters informed each of them that their employment at Linq is a breach of their Restrictive Covenants, attached a copy of their Restrictive Covenants, stated that there was reason to believe that they are directly soliciting Echo's clients in breach of their obligations under their Restrictive Covenants, reminded them of their obligations under their Restrictive Covenants, and demanded that they immediately cease their violations of their Restrictive Covenants.

70.     Also on July 3, Echo sent a letter to Linq, which is attached as Exhibit J ("Linq Cease and Desist Letter").  The Linq Cease and Desist Letter informed Linq that Buckley, Scheetz, Mercer, and Huszar are former Echo employees, that each of them has contractual obligations to Echo, and that Echo suspects that they are not abiding by those obligations.  The Linq Cease and Desist Letter further stated that the timing and circumstances with which Buckley, Scheetz, Mercer, and Huszar left Echo to join Linq suggests that there was an improper solicitation of Echo's employees.  After listing a summary of some of Buckley's, Scheetz's,

15

Mercer's, and Huszar's contractual obligations, Echo advised Linq that it would take legal action if Linq encouraged or allowed for breach of Buckley's, Scheetz's, Mercer's, and Huszar's contractual obligations, or otherwise interfered with Echo's rights.

71.     Before burdening this Court, Echo reached out to counsel for Linq attempting to resolve this matter.

72.     Rather than cease its improper action, Linq has continued to employ and encourage the actions of Buckley, Scheetz, Mercer, Lucania, and Huszar.  Moreover, Linq has continued to solicit Echo's customers, solicit Echo's employees, and use Echo's confidential information.

73.     Indeed, as recently as July 26, 2018, Matt Klund, a sales manager at Linq, friend-requested an Echo employee on LinkedIn.  Presumably, this is yet another angle of attack on Echo's employee base.

74.     Given the surreptitious nature of Linq's attack on Echo, Echo suspects that Linq is also employing other methods to raid Echo's employee base and customers.  In fact, Echo has recently learned that Linq is instructing Echo former employees not to disclose to Echo that they are going to Linq.  Indeed, Echo believes that there are other Echo former employees currently violating their Restrictive Covenants by working at Linq, but has yet to confirm.  Echo continues to investigate.

75.     Linq has also told Echo defectors that it is aware of the Restrictive Covenants, but is not concerned with them.

76.     The hiring of Echo employees by Linq has resulted in a decrease in business to Echo.

77.     For example, one of Huszar's largest customers dropped 70% in two months.

16

78.     Likewise, several of Mercer's clients have ceased utilizing Echo for any business over the past few months.

79.     The employment of Buckley, Scheetz, Mercer, Lucania, and Huszar at Linq seriously impinges the goodwill and long-standing customer relationships that Echo developed over the past several years.

80.     The damage to Echo if they are allowed to continue to service Echo customers is incalculable, because it took, in some cases, several years to develop these relationships, they have become primary, significant relationships, and if they are allowed to continue to service the customers, the relationships may become irreparable.

81.     Likewise, Linq's continued solicitation of Echo employees, knowing that each is bound to a restrictive covenant, is disrupting Echo's workforce and also diminishing Echo's goodwill in the marketplace.

82.     Further, Linq knowingly allowing the former Echo employees to breach their obligations to Echo is resulting in immeasurable harm to Echo's long-standing customer relationships.

83.     In short, money damages alone would not make Echo whole for the actions of Buckley, Scheetz, Mercer, Lucania, Huszar, and Linq.

**COUNT I**
**Breach of Contract**
**(Buckley, Scheetz, Mercer, Lucania, and Huszar)**

84.     Echo incorporates by reference all allegations in all preceding and subsequent paragraphs of this Complaint as if fully set forth herein.

85.     The Restrictive Covenants are valid and enforceable.

86.     Echo has fully performed every obligation it owes to the individual Defendants under the Restrictive Covenants.

87.     As set forth in the Restrictive Covenants, each of the individual Defendants agreed to:  (1) for a period of 6 months after termination from Echo, refrain from engaging or participating in any business which competes with Echo; (2) refrain from using or disclosing Echo's confidential information outside of Echo; (3) for a period of 18 months after termination from Echo, refrain from soliciting or servicing any Echo customers (i) for whom they performed services on behalf of Echo, (ii) with whom they had substantial contact as a result of or in connection with their Echo employment, or (iii) for whom they had access to or acquired confidential information as a result of or in connection with their Echo employment; and (4) for a period of 18 months, refrain from soliciting Echo employees.

88.     Buckley breached the Buckley Restrictive Covenant by, among other things: (1) competing with Echo at Linq; (2) using and disclosing Echo's confidential information; (3) soliciting Echo's customers; and (4) soliciting Echo's employees to work at Linq.

89.     Scheetz breached the Buckley Restrictive Covenant by, among other things: (1) competing with Echo at Linq; (2) using and disclosing Echo's confidential information; (3) soliciting Echo's customers; and (4) soliciting Echo's employees to work at Linq.

90.     Mercer breached the Buckley Restrictive Covenant by, among other things: (1) competing with Echo at Linq; (2) using and disclosing Echo's confidential information; (3) soliciting Echo's customers; and (4) soliciting Echo's employees to work at Linq.

91.     Lucania breached the Buckley Restrictive Covenant by, among other things: (1) competing with Echo at Linq; (2) using and disclosing Echo's confidential information; (3) soliciting Echo's customers; and (4) soliciting Echo's employees to work at Linq.

92.     Huszar breached the Buckley Restrictive Covenant by, among other things: (1) competing with Echo at Linq; (2) using and disclosing Echo's confidential information; (3) soliciting Echo's customers; and (4) soliciting Echo's employees to work at Linq.

93.     Echo has and continues to suffer damages as a result of Mercer's, Scheetz's, Buckley's, Lucania's, and Huszar's breaches of their Restrictive Covenants, including the loss of customers and sales, the loss of employees, and the diminishment of value in its confidential information.

94.     Unless restrained, Buckley, Scheetz, Mercer, Lucania, and Huszar will continue to breach their Restrictive Covenants, causing continued and irreparable injury to Echo, loss of customers and sales, and diminishment of value in its confidential information.

95.     Echo also requests an order that Buckley, Scheetz, Mercer, Lucania, and Huszar provide a full accounting as to the whereabouts of all of Echo's confidential information and other property in their possession, and the return of all of Echo's confidential information and other property in their possession.

WHEREFORE, Echo respectfully requests the following relief against Mercer, Scheetz, Buckley, Lucania, and Huszar:

a)     Enter judgment for Echo and against Buckley, Scheetz, Mercer, Lucania, and Huszar on Count I of the Complaint;

b)     Enter a temporary restraining order and thereafter, a preliminary injunction restraining and enjoining Buckley, Scheetz, Mercer, Lucania, and Huszar from retaining, using, disclosing, or misappropriating any of Echo's confidential information;

c)     Enter a mandatory injunction requiring Buckley, Scheetz, Mercer, Lucania, and Huszar to return to Echo any and all of Echo's confidential information and any copies in their possession, custody, or control;

d)     Permanently enjoin Buckley, Scheetz, Mercer, Lucania, and Huszar from violating their Restrictive Covenants;

e)      Order Buckley, Scheetz, Mercer, Lucania, and Huszar to provide a full accounting as to the whereabouts of all of Echo's confidential information and other property in their possession, custody, or control;

f)      Award all of Echo's economic, consequential, and/or nominal damages caused by Buckley's, Scheetz's, Mercer's, Lucania's, and Huszar's breaches of contract; and

g)      Award such other and further relief that this Court deems just and proper under the circumstances.

### COUNT II
### Tortious Interference with Contractual Relations
### (All Defendants)

96.    Echo incorporates by reference all allegations in all preceding and subsequent paragraphs of this Complaint as if fully set forth herein.

97.    Echo has valid and enforceable contractual relationships with its employees, which, among other things, prohibits those employees from competing with Echo for 6 months following cessation of their employment with Echo. Echo received substantial benefits from its contractual relationships with its employees and invested substantial sums in training and developing its employees. At all relevant times, all Defendants were aware of such contractual relationships.

98.    Prior to the Defendants' solicitation, Echo enjoyed advantageous economic and contractual relations with its customers, including Company K, which constituted valid and enforceable agreements. Echo received substantial profit from its economic and contractual relationship with these customers and invested substantial sums of money in soliciting, developing, and maintaining its economic relationships with these customers. At all relevant times, all Defendants were aware of such economic and contractual relationships.

99.    All Defendants deliberately, wrongfully, and without justification interfered with the contractual relationships between Echo and its employees, including but not limited to

20

Mercer, Scheetz, Buckley, Lucania, Huszar, and Cason, by inducing such employees to breach their contractual obligations to Echo and inducing these employees to use confidential information to the detriment of Echo and to Linq's advantage. As a result, these employees have in fact breached their contractual obligations to Echo, to the detriment of Echo and to Linq's advantage.

100. All Defendants deliberately, wrongfully, and without justification have interfered with the economic and contractual relationships between Echo and its customers, including but not limited to Company K, and through misappropriation of Echo's confidential information, have induced these customers to breach their economic and contractual obligations to Echo, to the detriment of Echo and to Linq's advantage. As a result, these customers have in fact breached their economic and contractual obligations to Echo, to the detriment of Echo and to Linq's advantage.

101. As a direct and proximate cause of all Defendants' conduct, Echo has sustained and will incur further damages, including but not limited to damages reflecting lost business, lost profits, and damage to its goodwill. Echo has also suffered and will continue to suffer immediate and irreparable harm.

102. All Defendants' wrongful acts and conduct was willful and malicious and Echo is therefore entitled to punitive damages.

WHEREFORE, Echo respectfully requests the following relief against all Defendants:

a)    Enter judgment for Echo and against all Defendants on Count II of the Complaint;

b)    Enter a temporary restraining order and thereafter, a preliminary injunction restraining and enjoining all Defendants from tortiously interfering with any of Echo's economic or contractual relationships with customers or employees;

c)     Enter a mandatory injunction requiring all Defendants to return to Echo any and all of Echo's confidential information and any copies in their possession, custody, or control;

d)     Permanently enjoin all Defendants from tortiously interfering with any of Echo's economic or contractual relationships with customers or employees;

e)     Order all Defendants to provide a full accounting as to the whereabouts of all of Echo's confidential information and other property in their possession, custody, or control;

f)     Order all Defendants to return all of Echo's confidential information and other property in their possession, custody, or control;

g)     Award all of Echo's economic, consequential, and/or nominal damages caused by all Defendants' tortious interference;

h)     Award Echo punitive damages for all Defendants' willful and malicious tortious interference;

i)     Award Echo its attorney's fees for all Defendants' willful and malicious tortious interference; and

j)     Award such other and further relief that this Court deems just and proper under the circumstances.

## COUNT III
### Tortious Interference with Prospective Economic Advantage
### (Linq, Scheetz, Mercer, Lucania, and Huszar)

103.    Echo incorporates by reference all allegations in all preceding and subsequent paragraphs of this Complaint as if fully set forth herein.

104.    Until the events giving rise to this action, Echo maintained valid business relationships, or the expectancy of business relationships, with its customers and/or prospective customers. Echo had the reasonable expectation that these relationships and prospective relationships would continue and would not be unjustifiably disrupted.

105.    Specifically, each of Scheetz, Mercer, Lucania, and Huszar (collectively, the "Individual Count III Defendants") had customer accounts that they serviced at Echo.

22

106.     Prior to each of the Individual Count III Defendants departures from Echo, they were tasked with transitioning their customer accounts to another Echo employee so that Echo could continue to service the customer accounts.

107.     Each of the Individual Count III Defendants had a Restrictive Covenant that, among other things, prohibited them from soliciting any of their Echo customers for 18 months after their termination from Echo.

108.     Yet, for each of the Individual Count III Defendants, there has been a precipitous drop in revenue for the customer accounts overseen by them since their departure from Echo.

109.     The Individual Count III Defendants deliberately, wrongfully, and without justification have interfered with the business relationships between Echo and its customers, including but not limited to Company K, and through misappropriation of Echo's confidential information, have induced these customers to move their business from Echo, to the detriment of Echo and to Linq's advantage.   As a result, these customers have in fact moved their business from Echo, to the detriment of Echo and to Linq's advantage.

110.     As a direct and proximate cause of Linq's and the Individual Count III Defendants' conduct, Echo has sustained and will incur further damages, including but not limited damages reflecting lost business, lost profits, and damage to its goodwill.  Echo has also suffered and will continue to suffer immediate and irreparable harm.

111.     Linq's and the Individual Count III Defendants' wrongful acts and conduct were willful and malicious and Echo is therefore entitled to punitive damages.

WHEREFORE, Echo respectfully requests the following relief against Linq and the Individual Count III Defendants:

        a)     Enter judgment for Echo and against Linq and the Individual Count III Defendants on Count III of the Complaint;

b)   Enter a temporary restraining order and thereafter, a preliminary injunction restraining and enjoining Linq and the Individual Count III Defendants from tortiously interfering with any of Echo's relationships with customers;

c)   Enter a mandatory injunction requiring Linq and the Individual Count III Defendants to return to Echo any and all of Echo's confidential information and any copies in their possession, custody, or control;

d)   Permanently enjoin Linq and the Individual Count III Defendants from tortiously interfering with any of Echo's relationships with customers;

e)   Order Linq and the Individual Count III Defendants to provide a full accounting as to the whereabouts of all of Echo's confidential information and other property in their possession, custody, or control;

f)   Order Linq and the Individual Count III Defendants to return all of Echo's confidential information and other property in their possession, custody, or control;

g)   Award all of Echo's economic, consequential and/or nominal damages caused by Linq's and the Individual Count III Defendants' tortious interference;

h)   Award Echo punitive damages for Linq's and the Individual Count III Defendants' willful and malicious tortious interference;

i)   Award Echo its attorney's fees for Linq's and the Individual Count III Defendants' willful and malicious tortious interference; and

j)   Award such other and further relief that this Court deems just and proper under the circumstances.

**COUNT IV**
**Unfair Competition**
**(Linq)**

112.   Echo incorporates by reference all allegations in all preceding and subsequent paragraphs of this Complaint as if fully set forth herein.

113.   Since early 2018, Linq has engaged in unfair competition through its ongoing campaign to poach trained Echo employees, induce them to breach their obligations to Echo, and steal Echo's customers for the benefit of Linq and to the detriment of Echo.

24

114.     As a direct and proximate cause of Linq's conduct, Echo has sustained and will incur further damages, including but not limited damages reflecting lost business, lost profits, and damage to its goodwill.  Echo has also suffered and will continue to suffer immediate and irreparable harm.

115.     Linq's wrongful acts and conduct was willful and malicious and Echo is therefore entitled to punitive damages.

WHEREFORE, Echo respectfully requests the following relief against Linq:

a)       Enter judgment for it and against Linq on Count IV of the Complaint;

b)       Enter a temporary restraining order and thereafter, a preliminary injunction restraining and enjoining Linq from tortiously interfering with any of its economic or contractual relationships with customers or employees;

c)       Enter a mandatory injunction requiring Linq to return to Echo any and all of Echo's confidential information and any copies in its possession, custody, or control;

d)       Permanently enjoin Linq from tortiously interfering with any of its economic or contractual relationships with customers or employees;

e)       Order Linq to provide a full accounting as to the whereabouts of all of Echo's confidential information and other property in its possession, custody, or control;

f)       Order Linq to return all of Echo's confidential information and other property in its possession, custody, or control;

g)       Award all of Echo's economic, consequential, and/or nominal damages caused by Linq's unfair competition;

h)       Award Echo punitive damages for Linq's willful and malicious unfair competition;

i)       Award Echo its attorney's fees for Linq's willful and malicious unfair competition; and

j)       Award such other and further relief that this Court deems just and proper under the circumstances.

## <u>JURY TRIAL DEMANDED</u>

Plaintiff hereby demands a trial by jury on all matters so triable.


Dated:  August 13, 2018                          Respectfully submitted,


By:  /s/ Jason P. Stiehl
       Jason P. Stiehl
       John A. Cotiguala
       LOEB & LOEB LLP
       321 North Clark Street
       Suite 2300
       Chicago, IL 60654
       Telephone:  (312) 464-3100
       Facsimile:  (312) 464-3111
       jstiehl@loeb.com
       jcotiguala@loeb.com

       *Attorneys for Plaintiff*
       *ECHO GLOBAL LOGISTICS, INC.*

## **CERTIFICATE OF SERVICE**

I, Jason P. Stiehl, hereby certify that a true and correct copy of the foregoing document has been served on all counsel of record via the Court's Case Management/Electronic Case Filing and/or electronic mail on **August 13, 2018**.

Dated:  August 13, 2018

By:  /s/ Jason P. Stiehl
Jason P. Stiehl
John A. Cotiguala
LOEB & LOEB LLP
321 North Clark Street
Suite 2300
Chicago, IL 60654
Telephone:  (312) 464-3100
Facsimile:  (312) 464-3111
jstiehl@loeb.com
jcotiguala@loeb.com

*Attorneys for Plaintiff*
*ECHO GLOBAL LOGISTICS, INC*